```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                            -  -  -

 4    UNITED STATES OF AMERICA,   :     Criminal Action
                                  :
 5               Plaintiff,       :
                                  :
 6          v.                    :
                                  :
 7    DAVID MATUSIEWICZ,          :
                                  :
 8               Defendant.       :     No. 08-69-GMS

 9                            -  -  -

10                      Wilmington, Delaware
                      Thursday, December 10, 2009
11                         10:00 a.m.

12                            -  -  -

13

14    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

15

16    APPEARANCES:

17

18            CHRISTOPHER J. BURKE, ESQ.
              Assistant United States Attorney
19
                            Counsel for Government
20
              HERIBERTO MEDRANO, ESQ.
21            (Harlingen, TX)

22                            Counsel for Defendant

23

24

25
```

```
 1                    THE COURT:  Good morning.  Please be seated.

 2                    Mr. Burke.

 3                    MR. BURKE:  Good morning, Your Honor.

 4                    Your Honor, Christopher Burke for the United

 5      States.

 6                    Your Honor, now is the Court time the Court has

 7      set for a sentencing hearing in the matter of United States

 8      versus David Matusiewicz -- it is Criminal Action

 9      08-69-GMS -- in this courtroom.  Your Honor, I note for the

10      record that the defendant and his counsel, Mr. Medrano, are

11      present in the courtroom.

12                    MR. MEDRANO:  Good morning, Your Honor.

13                    MR. BURKE:  I know the Court, of course, will go

14      through the Sentencing Guideline calculations.  Just for the

15      Court's information -- and Mr. Medrano can confirm this --

16      as I understand it, there are no factual objections to the

17      PSR at this stage.  There are obviously a number of other

18      objections to the enhancements.  I don't know whether the

19      Court wishes us to address them.  We are prepared to do

20      whatever the Court's wishes.

21                    THE COURT:  Thank you, Mr. Burke.

22                    Good morning, Mr. Medrano.

23                    Good morning, Dr. Matusiewicz.  Please take your

24      seats.

25                    Technically, I am uncertain as to whether these
```

1    are factual objections or not.

2              I am going to go through it in the way that I

3    see fit, based upon the submissions, the written submissions

4    that I have seen.  I found it somewhat difficult to

5    categorize some of the defendant's submissions as in the

6    nature of factual objections, impressions, legal objections.

7    I am going to make a statement regarding that.

8              But first, at the end of the Court's rulings, if

9    either party wishes to have me address this or make further

10   comment, I am certainly willing to entertain that comment.

11             So, let's begin.

12             Mr. Medrano, have you received a copy of the

13   October 26, 2009 presentence investigation report and its

14   November 24 revision?

15             MR. MEDRANO:  Yes, sir.

16             THE COURT:  Are there any further revisions?

17             MR. MEDRANO:  No, Your Honor.

18             THE COURT:  You don't have to pop up and down

19   while we are in this phase.  Please, feel free to remain

20   seated if you desire.  It's up to you.

21             Mr. Burke, as far as you know, was any

22   information withheld from this report?

23             MR. BURKE:  No, Your Honor.

24             THE COURT:  Dr. Matusiewicz, have you had an

25   opportunity to read the presentence report and the November

1    revision?

2              THE DEFENDANT:  I have.

3              THE COURT:  Have you had a chance to discuss

4    these matters with your lawyer?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Now, I am going to now go into the

7    statement that I just previewed.  It is as follows.  I

8    understand that there are a number of "factual objections."

9    I will put that in quotes, in spite of what you said, Mr.

10   Burke, to the revised presentence report.

11             Mr. Medrano, you filed a document with the Court

12   that was styled, quote, "Objections to Presentence

13   Investigation Report."  This document contained many

14   assertions, some of which at least appeared to me to be

15   factual objections, others of which were legal objections, I

16   think it's fair to say, and others which were in my view

17   simply arguments on how the Court should interpret the facts

18   of the case, which in my view would more properly have been

19   presented either in your sentencing memorandum, which was a

20   separate document, or else today at sentencing.

21             I won't preclude you from any additional

22   observations, obviously.  The objections document does not

23   distinguish between factual objections, legal objections and

24   other assertions that are simply, quote, "for the Court's

25   information."  Nor has defendant formally moved for a

1    departure, I think it's beyond dispute, unless someone wants

2    to pursue that.  I have no motion for departure in front of

3    me.

4              MR. MEDRANO:  Your Honor, there is a request,

5    depending on what the assessment is concerning the

6    enhancements that were filed, for time served, which would

7    call for a departure.

8              THE COURT:  Mr. Medrano, in this District, in

9    the Third Circuit, what a departure is is very clear.  If

10   you are familiar with the case United States v. Lofink, you

11   would know that.  I have not seen filed any motion, anything

12   styled a motion for departure.  Is that accurate or not?

13             MR. MEDRANO:  That is true.

14             THE COURT:  So you can take your seat.

15             Does the government concur in that view?

16             MR. BURKE:  Yes, Your Honor.  The government's

17   view is that the defense has requested a variance.

18             THE COURT:  Yes.  Because I don't want to come

19   back here at a later date having the circuit tell me you

20   didn't dot this "i" and cross this "t."  I have before me,

21   by my best recollection, and best guesstimate, and best

22   understanding, no motion for a departure.  Are we agreed?

23             MR. BURKE:  Correct, Your Honor.

24             MR. MEDRANO:  That's correct.

25             THE COURT:  So, consequently, the Court has done

1    its best to discern the import of each of the objections,

2    documents, assertions.

3            I will first address what I believe to be the

4    factual objections to the presentence report.  In a few

5    moments, I will address what I believe to be the legal

6    objections.  The remaining assertions of the objections

7    document have been noted and will be taken into

8    consideration under the appropriate 3553(a) factors when we

9    get to that portion of this process, where it will then be

10   time to discuss an appropriate disposition by way of

11   sentence.

12           First, I count as an objection, and I will say

13   the defendant objects to Paragraphs 48 and 49 of the PSR on

14   the ground that the statement that Ms. Belford is not

15   seeking restitution for the $40,000 she did not receive in

16   the division of the marital property is inaccurate because

17   Ms. Belford did attempt to collect this $40,000 in State

18   Court.

19           The government states in both its November 12

20   and November 24 letters that it is not seeking restitution

21   as to the $40,000 in question.  It also stated in the

22   November 24 letter that it is clear from context that the

23   PSR was merely stating that Ms. Belford was not seeking the

24   $40,000 in restitution in this federal criminal proceeding.

25   In the revised presentence report, it does not appear that

1    Probation is recommending that this $40,000 be included in

2    any restitution.

3              The ruling is that I will overrule what I

4    believe to be an objection to the statement in the PSR that

5    Ms. Belford is not seeking the $40,000 in restitution.

6    While Ms. Belford might have once sought this amount in

7    State Court, the government correctly notes that she is not

8    seeking that the $40,000 be included in restitution in this

9    proceeding.  Since neither the government nor Probation

10   appears to be asking that this amount be included in

11   restitution, the defendant's request to exclude this amount

12   from restitution is simply moot.

13             2.  Dr. Matusiewicz objects to the depiction of

14   his association with the Millionaire's Club provided in

15   Paragraphs 12 through 18 on the ground that it constitutes a

16   "misrepresentation that there was any criminal purpose to

17   his relationship with" the club.  The defendant insists that

18   his involvement with the club was that of an honest investor

19   with what he believed to be a legitimate "foreign investment

20   firm."

21             Probation states that Paragraphs 12 through 18

22   are accurate in its view, asserting that even if the club

23   may have appeared legitimate at the outset, the defendant's

24   association with the club included activities such as

25   obtaining false identification documents for himself, his

children, and his mother.   The government does not directly

respond to this objection, which it cites as an example of

an "objection" in which the defendant was not actually

objecting to any facts included, but instead was providing

additional facts for the Court's consideration and making

arguments as to how the facts in the PSR should be

interpreted by the Court.

The Court finds that the defendant's "objection"

is not actually an objection to any of the facts included in

Paragraphs 12 through 18, but, rather is an argument as to

how the Court should interpret those facts.   Thus, unless

the defendant can cite a specific assertion in Paragraphs 12

through 18 that he believes to be inaccurate, the Court need

not rule on the assertions and arguments made in this

portion of the defendant's "objections."

Is there anything you want to say?

MR. MEDRANO:   No, Your Honor.

THE COURT:   The defendant also "objects" to

Paragraphs 19 through 29 of the presentence report on the

ground that the paragraphs contain an incomplete accounting

statement and an incomplete description regarding what

happened to the $249,000 that Dr. Matusiewicz obtained from

WSFS.   Here, too, defendant does not appear to take issue

with any specific statements or assertions in the PSR.

Instead, he provides a number of additional facts and

1    arguments that apparently he wishes the Court to consider.

2    The government in its letter dated November 24 responds to a

3    number of the assertions made by the defendant in this

4    "objection."  The Court finds these statements would have

5    more appropriately been included in the sentencing

6    memorandum, and, indeed, do not constitute "objections" to

7    the paragraphs in the PSR.  Therefore, the Court will not

8    respond at this stage to the assertions and arguments made

9    in this portion of the defendant's objections.

10              Similarly, the Court finds that the defendant's

11   "objections" to Paragraphs 8, 10, and 42 through 49 are not

12   actually factual objections.  The defendant's "objections"

13   to these paragraphs simply contain additional information

14   that he wishes the Court to consider, at least in my view,

15   when I determine an appropriate sentence.  The government

16   does not respond to the substance of these portions of the

17   "objections" document and stated that it would not object to

18   their inclusion in the PSR.  The Court therefore will take

19   the statements made in these portions of the "objections"

20   into consideration in determining a sentence, as it will

21   consider all information that has been properly submitted to

22   the Court.

23              Any problem with that?

24              MR. MEDRANO:  No, Your Honor.

25              MR. BURKE:  No, Your Honor.

1          THE COURT:  Dr. Matusiewicz, do you have any

2    other objections to any of the factual information already

3    included in the PSR?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  Does the government concur?

6          MR. BURKE:  Yes, Your Honor.

7          THE COURT:  Then pursuant to Federal Rule of

8    Criminal Procedure 32(i)(3)(A), the facts as represented in

9    the revised presentence investigation report are hereby

10   adopted by the Court.

11         By my count, moving on to the issue of legal

12   objections, legal issues, there are nine legal objections to

13   the revised PSR.  I am going to address them now.

14         Defendant has objected to the 12-level

15   enhancement provided -- let me say, before I do this, I have

16   received written submissions on these.  I feel fully

17   informed on the matters, and I am prepared to rule and do

18   so.

19         Again, the defendant has objected to the

20   12-level enhancement provided in Paragraph 57 on the ground

21   that this offense did not involve any loss to WSFS since all

22   the money was eventually returned.

23         Both the revised PSR and the government's

24   November 12 letter specify the amounts included in the

25   calculated loss to WSFS.  As to the credit for moneys that

1    were returned, the government points out in its November 24

2    letter that since the return of these funds was done or

3    accomplished by the government without the assistance of the

4    defendant or anyone acting jointly with the defendant, the

5    returned money cannot be counted as a credit against loss.

6    Probation similarly responds that Dr. Matusiewicz does not

7    qualify for any credit against loss as well.

8            The Court will overrule the defendant's

9    objection.  The enhancement is meant to reflect not the

10   amount of money currently in WSFS's possession, as would be

11   the case if the Court were saying an amount owed in

12   restitution.  Instead, the enhancement reflects the

13   magnitude of the defendant's offense.  In that regard, the

14   fact that the money was returned without Dr. Matusiewicz's

15   knowledge and after the offense was detected does not serve

16   to negate the enhancement specified in Paragraphs 57,

17   pursuant to Application Note 3(e) of Section 2B1.1 of the

18   Sentencing Guidelines.  Since the defendant has not objected

19   to any of the items of loss specified in Paragraph 57 of the

20   revised PSR and since no credit against loss applies, this

21   objection is overruled.

22           Next.  The defendant objects to a two-level

23   enhancement for the use of "sophisticated means," provided

24   in Paragraph 58 of the PSR.  Defendant contends that the

25   forging of his ex-wife's signature on a loan document and a

1     subsequent transfer of the money to an overseas bank account

2     does not rise to the level of "especially complex or

3     intricate offense conduct," as described in Application Note

4     8(B) to Section 2B1.1 of the Guidelines, and that the

5     government was able to "quickly and easily" identify where

6     Dr. Matusiewicz had sent the money.

7              The Court is going to overrule this objection.

8     As stated in Application Note 8(B) to Section 2B1.1, conduct

9     such as "hiding assets or transactions, or both, through the

10    use of fictitious entities, corporate shells, or offshore

11    financial accounts...ordinarily indicates sophisticated

12    means."  The government notes in both its November 24 letter

13    and its sentencing memorandum that the government had to

14    expend considerable time and resources to obtain the records

15    regarding the overseas bank account that Dr. Matusiewicz had

16    used and to determine the relationship between the defendant

17    and the various entities connected to that account.  This

18    seems, in this Court's view, to be precisely the type of

19    case to which the sophisticated means enhancement was meant

20    to apply.  The objection is therefore overruled.

21             Dr. Matusiewicz next objects to the two-level

22    enhancement in Paragraph 59 for violating a prior judicial

23    order, which Dr. Matusiewicz violated by "transferring,

24    encumbering, concealing, or in any other way disposing of

25    any property" and by failing to notify his spouse of the

1  line of credit he took out on the home by signing her name

2  to the loan document.  Dr. Matusiewicz asserts that he was

3  to be awarded sole ownership of the property pursuant to

4  court order.

5       This objection, too, is overruled.  As the

6  government asserts in its response, the terms of the

7  settlement called for the defendant to obtain sole ownership

8  of the property and use proceeds from refinancing the

9  property to pay Ms. Belford $100,000.  In this case, of

10  course, Dr. Matusiewicz did not wait until Ms. Belford

11  transferred her deed to him to take out the loan, nor did he

12  ever pay Ms. Belford the $100,000.  Instead, he forged her

13  name on a loan document and absconded overseas or to another

14  country with the full proceeds of the fraudulently obtained

15  line of credit.  This certainly constituted a violation of

16  the judicial order which, as Probation correctly notes, did

17  not authorize Dr. Matusiewicz to commit fraud in order to

18  encumber the property before he obtained sole title and then

19  abscond with the full proceeds of the fraud.

20       Defendant has objected to Paragraph 61 of the

21  original PSR, which had provided for a two-level enhancement

22  for breach of a position of trust for the bank fraud charge.

23  The revised PSR does not include this enhancement.

24  Therefore, in my view, the defendant's objection is moot.

25       Any disagreement with that?

1           MR. BURKE:  No, Your Honor.

2           MR. MEDRANO:  No, Your Honor.

3           THE COURT:  As to Count Two, this is the

4    International Parental Kidnapping count, the defendant

5    objects to Paragraph 65's three-level enhancement for

6    "substantial interference with the administration of

7    justice."  The PSR includes this enhancement because the

8    defendant's conduct in kidnapping the children and taking

9    them overseas rendered the Family Court's order

10   unenforceable.  Dr. Matusiewicz asserts that the practical

11   effect of his actions in terms of the administration of

12   justice was to deny Ms. Belford her visitation rights, and

13   that this does not fall within the same category as perjury,

14   terminating a felony investigation, or causing the

15   unnecessary expenditure of substantial governmental

16   resources, which are examples of "substantial interference"

17   provided in the commentary to Section J1.2(b)(2) of the

18   Guidelines.

19          The government responds that the examples

20   provided in that commentary were not exclusive, and that Dr.

21   Matusiewicz's actions -- excuse me just a second -- Dr.

22   Matusiewicz's actions had the effect of "taking matters

23   completely outside the purview of the administration of

24   justice" and did, in fact, necessitate the expenditure of

25   significant government resources to ascertain the location

1   of the defendant and his children and retrieve them.

2   Probation similarly asserts that the enhancement is proper

3   because the defendant's actions directly contravened the

4   Court order, which, among other things, required that

5   "neither party shall do anything that may estrange them from

6   the other party."

7            The Court agrees with Probation, and will

8   overrule the objection.  It is difficult at best to conceive

9   of a more substantial interference with the administration

10  of justice in a divorce or custody case than a spouse

11  physically removing himself and his children or herself and

12  her children from the country, thereby completely preventing

13  enforcement of the Family Court's orders for an indefinite

14  and potentially unlimited period of time.  Furthermore, the

15  Family Court's jurisdiction over the matter obviously was

16  still ongoing and the orders concerning custody, visitation,

17  and other terms obviously remained and still remain, indeed,

18  open to modification.  Finally, as the government has noted

19  in its memorandum and letters, the government did have to

20  expend significant resources to investigate this case and

21  bring Dr. Matusiewicz back within the jurisdiction of the

22  courts of this state and country.  Specifically, as noted by

23  the government:  A significant array of governmental

24  agencies, including the United States Marshal's Service, the

25  New Castle County Police Department, the Federal Bureau of

Investigation, the United States Department of State, the United States Attorney's Office for the District of Delaware, the United States Department of Justice's Office of International Affairs, law enforcement officers in Australia, New Zealand and Nicaragua and others all participated in a year-and-a-half search to locate the defendant and his children.  These efforts involved a significant number of interviews, evidence-gathering techniques, and man- and woman-person-hours expended.  When the defendant was located, three Deputy United States Marshals traveled to Nicaragua to arrest him, with the help of Nicaraguan and State Department enforcement officers, taking custody of the defendant and returning him to the United States to face federal charges.  In addition, the kidnapping occasioned the expenditure of additional Delaware Family Court resources as well in that it led to additional Family Court proceedings regarding custody of the children and regarding marital property.

The defendant objected to the two-level enhancement provided in Paragraph 66 for "extensive planning" on the ground that he should not be punished for "taking the responsible action to provide for the comfort and welfare of his children while traveling with him."  The defendant also notes that the Guidelines do not define "extensive planning."

1           The objection is overruled.  The Court agrees

2     with Probation.  The defendant here purchased a motor home,

3     sold his practice, emptied his personal belongings from the

4     marital home, obtained a substantial sum of money through

5     bank fraud, and obtained false identification documents

6     before kidnapping his children.  This certainly constituted

7     extensive planning, much if not most of which appeared to

8     have been done with the aim of avoiding detection and

9     escaping the Court's jurisdiction.  The objection is

10    therefore overruled.

11          The defendant objects to the two-level

12    "vulnerable victim" enhancement that is provided in

13    Paragraph 67 on the ground that neither Ms. Belford nor the

14    children meet the definition of "vulnerable victims."  As to

15    the children, the defendant asserts that since he had been

16    awarded custodial care of all three children, he had the

17    authority to travel anywhere in the world with them.

18          The objection is overruled.  Here, too, the

19    Court agrees with Probation.  Application Note 2 to Section

20    3A1.1 of the Guidelines states that a vulnerable victim

21    includes "a person who is a victim of the offense of

22    conviction and any relevant conduct, and who is unusually

23    vulnerable due to age, physical or mental condition, or who

24    is otherwise particularly susceptible to criminal conduct."

25    Since this is a parental kidnapping charge, it is the

1    children of the defendant who are the victims of the crime,

2    and the Court, frankly, finds it difficult to conceive of a

3    case where the victims were more vulnerable than in this

4    one.  All children were five or under at the time of the

5    kidnapping, one was just two years old, and another was four

6    years old and dealing with the challenges of autism.  The

7    defendant's position as primary custodian at the time of the

8    kidnapping only enhances the vulnerability of these victims.

9                The objection is therefore overruled.

10               Finally, Dr. Matusiewicz objects to Paragraph

11   68, which provides for a two-level enhancement for breach of

12   Ms. Belford's private trust.  The defendant asserts Ms.

13   Belford had no confidential relationship with her

14   ex-husband, with whom she had been divorced for eight months

15   and had been involved in a contested custody dispute, from

16   which Dr. Matusiewicz had emerged as the primary custodian.

17               The Court will overrule this objection as well.

18               As an initial matter, this offense certainly

19   involved a breach of the private trust that existed between

20   Dr. Matusiewicz and his young children, and that is the

21   relationship that forms the justification for this

22   adjustment in the revised PSR.  Furthermore, before taking

23   the children with him out of the country, Dr. Matusiewicz

24   told Ms. Belford that he was taking them to Disney World.

25   It is probably fair to say that had he told Ms. Belford of

1    his true intention, she would have taken action to prevent

2    him from leaving the country with the children.  Once the

3    children were overseas, Dr. Matusiewicz told them that their

4    mother had perished, indeed, that she had committed suicide.

5    Furthermore, even as between divorced parents, there

6    necessarily must be some level of trust between the parents,

7    at a very minimum, that they will adhere to the Family

8    Court's orders and be forthright with one another regarding

9    important decisions in the life and care of their children.

10   By lying to Ms. Belford, kidnapping her children, and

11   telling his children that she had killed herself, Dr.

12   Matusiewicz breached his trust with both Ms. Belford and,

13   most importantly, with their children.  The objection is

14   therefore overruled.

15           I don't think there are any other legal

16   objections.  Is that correct?

17           MR. MEDRANO:  That's correct.

18           MR. BURKE:  That's correct, Your Honor.

19           THE COURT:  We will now go through the offense

20   computation, the Guideline computations.

21           Mr. Medrano, is there any objection that the

22   computation of the base offense level in this matter is

23   correctly set at 7 points?

24           MR. MEDRANO:  That's correct.

25           THE COURT:  The government concurs.

1          MR. BURKE:  Yes, Your Honor.

2          THE COURT:  Is there any objection with the

3    calculation in Paragraph 57, which provides for a 12-level

4    specific offense characteristic adjustment because the loss

5    was between $200,000 and $400,000?  Do we concur in that?

6          MR. BURKE:  Correct, Your Honor.

7          MR. MEDRANO:  Subject to my objections, yes.

8          THE COURT:  Other than that and based upon the

9    Court's ruling.

10         I will make that statement generally as it

11    applies to all of your objections.

12         MR. MEDRANO:  Thank you, Your Honor.

13         THE COURT:  So you don't have to reiterate that

14    position.

15         Again, understanding the Court's ruling, is

16    there any objection with the calculation in Paragraph 58

17    which provides for a two-level specific offense

18    characteristic adjustment for sophisticated means because

19    the offense was one involving the hiding of assets,

20    transactions, or both through the use of fictitious

21    entities, corporate entities, or offshore accounts?

22         MR. MEDRANO:  No objection.

23         MR. BURKE:  No objection.

24         THE COURT:  Is there any objection with the

25    calculation in Paragraph 59, which provides for a two-level

1    specific offense characteristic adjustment because the

2    offense involved a violation of a prior judicial order?

3    Again, understanding the position of defense on this.

4                MR. BURKE:  No objection, Your Honor.

5                MR. MEDRANO:  No, Your Honor.

6                THE COURT:  Is there any dispute that the

7    remaining calculations in Paragraphs 60 to 62, specifically,

8    no victim-related adjustments, no adjustments for role in

9    the offense, and no adjustments for obstruction of justice?

10               MR. BURKE:  Correct, Your Honor.

11               MR. MEDRANO:  That's correct.

12               THE COURT:  Is there any objection, given the

13   Court's ruling, to the adjusted offense level in this matter

14   as to Count One, the bank fraud count, being 23?

15               MR. BURKE:  Correct, Your Honor.

16               MR. MEDRANO:  That's correct.

17               THE COURT:  As to Count Two, is the base offense

18   level that the Court has determined, 14 points, correct in

19   your view?

20               MR. MEDRANO:  Yes, sir.

21               MR. BURKE:  Yes, Your Honor.

22               THE COURT:  Is there any objection with the

23   calculation in Paragraph 65 which provides for a three-level

24   specific offense characteristic adjustment because the loss

25   involved a substantial interference with the administration

1     of justice, again, keeping in mind the defense's position?

2               MR. BURKE:  No objection, Your Honor.

3               MR. MEDRANO:  No.

4               THE COURT:  Any objection to the calculation in

5     Paragraph 66, which provides for a two-level specific

6     offense characteristic adjustment for extensive planning,

7     again, understanding the Court's ruling?

8               MR. BURKE:  No objection, Your Honor.

9               MR. MEDRANO:  No objection.

10              THE COURT:  Is there any objection to Paragraph

11    67, which provides for a two-level victim-related adjustment

12    because the victims of the offense, specifically, Dr.

13    Matusiewicz's children, were vulnerable victims?  Again,

14    paying duty to the defendant's position on this.

15              MR. MEDRANO:  No, sir.

16              MR. BURKE:  No objection, Your Honor.

17              THE COURT:  Is there any objection with the

18    calculation in Paragraph 68, which provides for a two-level

19    enhancement for -- I am sorry, role in the offense

20    adjustment, rather, because Dr.  Matusiewicz abused a

21    position of private trust in committing this offense?

22    Again, I understand the defendant's position.  It has been

23    overruled.

24              MR. BURKE:  No objection, Your Honor.

25              THE COURT:  Any dispute with the remaining

```
 1      calculations in Paragraph 69, specifically, no adjustments

 2      for obstruction of justice?

 3                  MR. BURKE:  No objection, Your Honor.

 4                  MR. MEDRANO:  No.

 5                  THE COURT:  Any objection to the adjusted level

 6      again to be determined at 23?  Is that correct, gentlemen?

 7                  MR. MEDRANO:  That's correct.

 8                  MR. BURKE:  That's correct.

 9                  THE COURT:  Is there any objection to the

10      multiple-count adjustments in Paragraphs 71 through 75,

11      which yield a combined adjusted level of 25, given the

12      Court's ruling?

13                  MR. MEDRANO:  Subject to my objection.

14                  THE COURT:  Subject to the objections, yes.

15                  MR. BURKE:  No objection.

16                  THE COURT:  Let the record be clear that the

17      defense has waived no objection previously raised.  All of

18      the Court's previous statements account for those

19      objections.

20                  MR. MEDRANO:  Thank you.

21                  THE COURT:  The government has a motion for an

22      additional point.

23                  MR. BURKE:  Yes, Your Honor.  We make the motion

24      for the additional point for acceptance of responsibility.

25                  THE COURT:  The Court will grant the motion and
```

1    determine that a three-point reduction for acceptance of

2    responsibility is in order in this matter.

3                    That nets us, gentlemen, a total level of 22.

4    Is that correct?

5                    MR. BURKE:  That's correct, Your Honor.

6                    MR. MEDRANO:  That's correct.

7                    THE COURT:  Do we agree, gentlemen, that the

8    appropriate criminal history category in this matter is I?

9                    MR. BURKE:  Yes, Your Honor.

10                   MR. MEDRANO:  Yes, sir.

11                   THE COURT:  The Court will determine then that

12   the criminal history category in this matter is I.

13                   As a result of the Court's rulings, the Court

14   determines that the appropriate Guidelines are as follows:

15                   The total offense level is 22.

16                   The criminal history category is I.

17                   The advised range of imprisonment is 41 to 51

18   months.

19                   The supervised release range is three to five

20   years on Count One, and one year on Count Four, I believe.

21   Is that correct?

22                   MR. BURKE:  Yes, Your Honor.

23                   THE COURT:  The fine range is $7500 to

24   $1,000,000.

25                   Restitution, none is owing as to Count One.  As

```
 1      to Count Four, the Violent Crime Assistance Program is due
 2      $9,674.
 3                  And there are two $100 special assessments,
 4      totaling a $200 special assessment.
 5                  Other than the objections already noted and
 6      ruled upon, are there any objections to these calculations?
 7                  MR. BURKE:  No, Your Honor.
 8                  MR. MEDRANO:  No.
 9                  THE COURT:  Any other disputed matters, Mr.
10      Medrano?
11                  MR. MEDRANO:  No, Your Honor.
12                  THE COURT:  All right.  Then would you care to
13      address the Court on your client's behalf?
14                  MR. MEDRANO:  Your Honor, just to go ahead and
15      clarify the procedure, it is my understanding I will address
16      the Court, and will my client be allowed to address the
17      Court as well?
18                  THE COURT:  Absolutely, and anyone else you have
19      determined you would wish me to hear from.
20                  MR. MEDRANO:  Yes, Your Honor.
21                  First of all, thank you, Your Honor, for
22      allowing us to go ahead and come before the Court today and
23      to assist the Court in trying to do the very difficult job
24      of trying to assess what is the appropriate punishment that
25      the Court should impose on David Matusiewicz, given the
```

1       charges that he pled guilty to.

2               Judge, I will tell you that in the 30 years that

3       I have been practicing law, seven years as a federal

4       prosecutor, this is one of the more difficult cases that I

5       have been involved with, either as a prosecutor or defense

6       attorney.

7               This is not a situation where I am representing,

8       or when I was a prosecutor prosecuting, someone whose

9       history is a pattern of illegal conduct or disregard of the

10      law, or a disregard of his personal responsibilities as

11      either an adult or as a father.

12              On the contrary, I represent a gentleman who for

13      43 years of his life has never had a problem with the law; a

14      man who, up until he made the wrong decision to go ahead and

15      take matters into his own hands and abscond with his kids,

16      had played by the rules, had put in a lot of work, a lot of

17      sweat in educating himself, and who had been very

18      generous -- and I think this is what makes this even more

19      difficult -- very generous in giving back to his community;

20      a man who, not only did he work hard to be a success, but

21      didn't forget the people that were at the bottom of the

22      ladder still.

23              THE COURT:  Let me interrupt just for a second,

24      which I may do from time to time, both lawyers, just to

25      indicate for the record that, and I want to make sure that

1    there are no others, that I have received 17 letters, which

2    include one from Dr. Matusiewicz himself.

3                    MR. MEDRANO:  Yes, Your Honor.  There was an

4    additional one this morning even from the institution --

5                    THE COURT:  I have that.

6                    MR. MEDRANO:  Yes, Your Honor.

7                    May I continue, Your Honor?

8                    THE COURT:  From Ms. Angel Brown.

9                    MR. MEDRANO:  Yes, Your Honor.

10                   THE COURT:  Yes, you may continue.

11                   MR. MEDRANO:  Judge, one of the things that

12   makes this case a difficult case, makes it in a position

13   where I don't envy the Court's responsibilities of having to

14   go ahead and take everything into consideration, is what

15   this man did up until the point that he committed this

16   crime.

17                   It confuses one that deals with the criminal

18   justice system all the time, dealing with individuals whose

19   conduct is -- something like this would be just a pattern of

20   conduct in their past, and that is not the case that we are

21   facing here today.

22                   One of the things that I wanted to do was to go

23   ahead and point out to the Court the awards he has received,

24   Judge.  I tried to make copies of them.  But I couldn't,

25   because they are metal.

1          THE COURT:  Let the record reflect I see at

2    least three plaques, which look like awards for good

3    services.

4          MR. MEDRANO:  Yes, Your Honor.

5          THE COURT:  Good acts.

6          MR. MEDRANO:  Judge, we are not here to make

7    excuses as to what he did.  We are not here to say that he

8    should not go ahead and be punished for his actions.  He

9    takes full responsibility and admits that what he did was

10   incorrect.

11          I think what happened here, Judge, was that Mr.

12   Matusiewicz's judgment, which had been exemplary up until

13   the point that he committed this crime, was clouded by his

14   emotional attachment to his children; was clouded by the

15   turmoil and depression that he was experiencing because of

16   his divorce; was clouded by the fact that but for his

17   limited relationship and close relationship with his parents

18   and his sister and his three children, is one of isolation.

19   He does not come from a large family.

20          The loss of his brother to leukemia really took

21   a lot out of him, an extreme amount.  It was a long,

22   protracted, painful suffering, watching this man that was

23   his closest friend go ahead and pass away.

24          So I have to ask myself, however, Judge, what is

25   the best thing that can happen from now on?  What is the

1    solution that the Court should consider in determining what

2    is in the best interests not only of Mr. Matusiewicz because

3    of his ex-wife and of his three children as well?

4              If the Court is to go ahead and lock this man up

5    and send him to jail for three and a half years, which is

6    the bottom end of the Guidelines that the Court has

7    determined is applicable for consideration, he will not be

8    in a position to go ahead and try to make amends, not only

9    to his ex-wife, who he concedes he owes her approximately

10   $10,000 in taxes and attorneys' fees that were awarded by

11   the Family Court, but he will not be able to go ahead and

12   provide the child support and health insurance premiums for

13   his children so they can go ahead and be provided for and

14   given the care and attention that they need.  He can't do

15   that if he is in jail.  And there is no one else that can go

16   ahead and take on that role and duty and responsibility.

17             What are the chances, the odds that this man

18   would ever go ahead and commit any other crime?  I put it to

19   the Court that there is a 99.999-percent probability that

20   this Court will never see this young man before this Court

21   again for a violation of any terms and conditions concerning

22   his release.

23             THE COURT:  How can you be so certain about that

24   in your assertion?

25             MR. MEDRANO:  Judge, as I said before, seven

1    years of being a federal prosecutor, 23 years of being a

2    criminal defense attorney, all over the United States.

3                This is the atypical defendant, Your Honor.

4                The letter that he received even yesterday from

5    this counselor there at the institution there in Salem just

6    enhances and highlights the fact that this man has always

7    dedicated himself to helping people.  Even when he is in

8    jail, even when he is facing going to jail for an additional

9    amount of time, what does he do?  He raises his hands and

10   says, by the way, can I help you, two of these people, like,

11   I have got an education, I can help them with their GED

12   applications and so forth.  Instead of sitting in a corner,

13   sulking and being angry, he gets involved in helping people.

14               I mean, a lot of the plaques and certificates --

15   and I have traveled all the way from Texas, Judge, some of

16   these plaques are granite and heavy as can be -- but of all

17   of the plaques he gave me and showed me, this is the one he

18   is most proud of:  his involvement in the Special Olympics.

19   For seven years he volunteers his time to go ahead and help

20   these kids.  He instituted this program almost by himself.

21               THE COURT:  I am well aware of Special

22   Olympians.  My brother was a Special Olympian.  So I am

23   intimately familiar with that.  These are good things.

24   There is no denying it.

25               I daresay, however, you would have lost a lot of

1    money had you made a bet before these acts in which he

2    engaged before that he would ever do it.

3              MR. MEDRANO:  That's right, Your Honor.

4              THE COURT:  That is one of the reasons why I

5    question it.  I don't take strong difference with your

6    prediction that he is unlikely to re-offend, particularly in

7    this way.  But he did it this time.

8              MR. MEDRANO:  Yes, sir, he did.  That's why even

9    the Guidelines themselves and the case law says that

10   whenever there is an aberration of conduct that is present

11   with a defendant, that is a factor that the Court can take

12   into consideration in determining what is the appropriate

13   sentence to be imposed.

14              Judge, if ever there was a case that screamed

15   out that this is an aberration in his conduct and behavior

16   and personality and his life, it's this case.

17              I don't know what the Court is going to do.  I

18   would only encourage the Court to go ahead and consider

19   that -- look at the letters of recommendation that he

20   received, even from his colleagues that work with him, there

21   are some doctors that even told us in those letters, you

22   know what?  Even though he has admitted this crime and I

23   don't agree with what he did, I know him and can vouch for

24   him so well that he has a job waiting for him here when he

25   goes and comes back out.

1          That is a real testament to the type of

2    relationship and fostering of trust that he has gone ahead

3    and done with his colleagues.

4          Judge, all of us, all of us, have made mistakes,

5    all of us.  Some mistakes are minor.  Some mistakes are much

6    more serious.  And we as adults must pay for our mistakes

7    and be held accountable for them.  All of us do that.

8          THE COURT:  Mr. Medrano, one of the things that

9    is of concern, among many, in this case is, it seems that

10   your client and others who have written on his behalf,

11   including the co-defendant, have wanted to point the finger

12   of blame at mom, at the mother of his children.  I find that

13   concerning.  I have seen, as best I can tell, no evidence of

14   any complaint made by your client prior to these acts, prior

15   to him commencing the planning to commit these ultimate

16   acts, to any civilian authority, any criminal authority, to

17   anyone, even those who wrote on his behalf pointed to no

18   facts.  They made bald assertions that this was done to

19   protect his children.  But they offer no insight, factual

20   insight to me as to how they knew that.  It wasn't suggested

21   in any of these letters that they had, any of the writers

22   had had conversations with this gentleman or that they had

23   seen any evidence in the behavior of the children, had heard

24   anything from mom or anybody that would have indicated

25   factually that Laura was in jeopardy, that Leigh was in

1    jeopardy, that Karen was in any kind of jeopardy.

2              The Court didn't see fit to make that finding.

3    Indeed, it awarded joint legal custody and joint physical

4    custody.

5              MR. MEDRANO:  Yes, sir.

6              THE COURT:  I am just trying to understand that.

7    Can you help me?

8              MR. MEDRANO:  Judge, if I could go ahead and

9    figure that out, I would be a very, very rich man.  That's

10   one of the reasons why I don't practice family law, because

11   I have found out from my experience and my friends who do

12   practice family law that when you are going through a

13   divorce, when there is kids involved, when you are devoted

14   to them, emotions take over.

15             THE COURT:  I understand that.

16             MR. MEDRANO:  I think that's what happened in

17   this case.  In the letter that I saw by Dr. Matusiewicz, he

18   openly and readily admits that it was his emotions that went

19   ahead and clouded his judgment and that affected him, or he

20   would have gone ahead and done something very different than

21   what he did.  He made a mistake.  His emotions based on the

22   situation took over him.

23             THE COURT:  I understand that.  But there were

24   times leading up to his departure with the kids for

25   reflection.  This was not an impulsive act.  This was a

1    calculated act, or a series of calculated acts.  And I could

2    better accept your assertion in this regard if it had been a

3    one-time thing, an act of impulse, he suddenly rushes into

4    the home and flees with the children.  That wasn't what

5    happened here.

6              That's concerning.

7              MR. MEDRANO:  Yes, sir.  Obviously, different

8    people, I think, react differently to situations.  Some of

9    them go ahead and hold it inside until it just explodes, and

10   people will go ahead and do even worse things in those

11   situations.  Others go ahead and keep it inside and it eats

12   them away so they become bitter and depressed and isolate

13   themselves.

14             Others, like David, went ahead and decided to go

15   ahead and take things into his own hands and try to go ahead

16   and provide an alternative raising of his kids.  And that's

17   what he did.

18             You know, Judge, when you said something about

19   the fact that it would appear that the Court has a concept

20   that he, himself, is shifting the blame for his actions, I

21   would beg to differ, sir.  That's not what he is doing, sir.

22   He has readily admitted that he committed a crime.  He has

23   readily admitted that he shouldn't have done, taken the

24   actions that he did.

25             THE COURT:  But did I misread, is it not offered

1    by the Doctor himself and others that he did this to protect

2    his children?

3              MR. MEDRANO:  I think -- I don't know what was

4    the context of the conversations or the context of the other

5    people making reference to the fact that he is a devoted

6    father and he is concerned with his kids.  I don't know that

7    because I didn't speak with those individuals.

8              THE COURT:  I am talking about the letters.

9              MR. MEDRANO:  But I will tell the Court that his

10   assessment of trying to bring to the Court's attention, you

11   know, what his belief was was to inform the Court and

12   educate the Court, for lack of a better term, as to what was

13   the motive and what was his frame of mind at the time that

14   he committed the crime.

15             This is not a situation where a man who has a

16   successful practice, a leader amongst peers, did this for a

17   selfish reason.

18             THE COURT:  Let me get you to let you inside my

19   thoughts on that a little bit, because it does appear to me

20   that that is a distinct possibility, that there was selfish

21   motivation, and the motivation was to strike out against his

22   ex-wife, or his wife at the time, actually, his wife at the

23   time.

24             MR. MEDRANO:  Well, they were --

25             THE COURT:  They were divorced by that time.  So

1    I spoke accurately.  His ex-wife.

2              MR. MEDRANO:  Judge, that this was a bitter

3    divorce is not a doubt.  This was an extremely bitter

4    divorce.

5              THE COURT:  Yes, it was.

6              MR. MEDRANO:  It was a contested, hard-fought

7    child custody issue.  And the fact that both parties did

8    certain things, her filing --

9              THE COURT:  They both filed PFAs.

10             MR. MEDRANO:  Having him arrested the night

11   before the day he was supposed to be awarded this very

12   prestigious honor of being one of the best, all of that

13   serves to go ahead and just create grudges and hard

14   feelings, and, "You know what?  I can't believe she did this

15   to me, so I am going to do something to her."

16             We all know that.  Unfortunately, that is the

17   darker side of human nature.

18             But what's going to happen to Dr. Matusiewicz

19   and his responsibilities to himself, to his kids, to

20   society?

21             I would ask the Court to go ahead and consider

22   the fact that every person in this country, everyone,

23   deserves to go ahead and have a second chance.  He has been

24   in jail now ten months, a man who never spent one hour in a

25   jail anywhere.

```
1              This is what is unique about this case.  He has

2    a plan for what he is going to do when he leaves jail.  I

3    have never had another defendant that I have represented or

4    that I have prosecuted that literally said, look, I have

5    this job waiting for me.  I have already got the

6    credentials.  This is what I have done in the past.  Give me

7    a chance to become a productive member of society.

8              THE COURT:  I respect your years of practice and

9    the fact, sir, that you have got 30 years of experience.  I

10   have been doing this more than 33 years as a prosecutor, a

11   chief federal prosecutor, as a defense lawyer, now as a

12   judge for 11 years.  And I have on more than one occasion

13   seen individuals come with a plan.

14             There are clearly unique aspects, unusual

15   aspects to this case.  But they are not unprecedented.

16             MR. MEDRANO:  I can only speak from my

17   experience, Your Honor.  Here is a young man, and he is

18   still a young man at 43 --

19             THE COURT:  And will be, will be given a second

20   chance at reintegration into society, whether it be today or

21   at some point in the future.  He will be given a second

22   chance.  Perhaps you didn't mean it this way.  I think it's

23   unreasonable to intimate that should this Court continue his

24   incarceration that that will be depriving him, or deprive

25   him of a second chance.  It will not.
```

1              MR. MEDRANO:  No.  That is not what I meant.

2      What I am saying is, given the fact that here you have a

3      gentleman who wants to go ahead and resume his

4      responsibilities, and his giving back to society, and to

5      fulfill the financial needs of his children, what purpose,

6      what purpose would outweigh those considerations that would

7      justify going ahead and continuing his incarceration?

8              I mean, you incarcerate him for another six

9      months, one year, 18 months, whatever the Court imposes, how

10     does that go ahead and benefit anyone, other than the fact

11     that he is in jail for 18 months wasting away?

12             THE COURT:  But you minimize, and I understand

13     it, you are an advocate for your client, you minimize the

14     other goals of sentencing.  And you are familiar with them

15     as a federal prosecutor.  I don't take umbrage at that.  In

16     asking that question, you must have on your mind or know

17     that I have on my mind the other goals of sentencing that

18     have not been yet addressed and that I am sure Mr. Burke

19     will discuss in a few moments.

20             MR. MEDRANO:  The issue to remember, the most

21     important thing is, you know, had he gone ahead and done

22     something that physically struck out at someone, had he gone

23     ahead and struck out physically at his ex-wife, or had

24     physically harmed his children, or had gone ahead and done

25     something of a violent nature, then I would be here not

1    advocating what I have been advocating, because then, in my

2    opinion, he would not deserve the consideration that I am

3    asking this Court to go ahead and give him.

4              And this Court, just as has been pointed out,

5    this Court has seen many different types of defendants come

6    before it.  And just like there is different flavors of soft

7    drinks, there is different categories of criminals.

8              This crime that he committed is not one that in

9    my opinion merits him being continued with incarceration,

10   especially 41 months.

11             As I said before, if this was a pattern, Judge,

12   of misconduct or criminality of this man, it would be

13   different.  But this is an aberration.  This is

14   once-in-a-lifetime type of conduct that is reprehensible,

15   deserves punishment.  He has pled guilty.  But he deserves

16   to go ahead and have an opportunity to try to make right, to

17   try to mitigate the damage that he has committed not only to

18   himself, to his family, to his friends, most importantly, to

19   his children.

20             So I ask the Court to take that into

21   consideration.

22             THE COURT:  Thank you, Mr. Medrano.

23             Do you wish me to hear from your client?

24             MR. MEDRANO:  Please, sir.

25             THE DEFENDANT:  Forgive me, Your Honor.  I am a

```
 1   little nervous this morning.
 2               THE COURT:  That is understandable.
 3               THE DEFENDANT:  I hope you had an opportunity to
 4   read my letter to you.
 5               THE COURT:  Thank you.
 6               THE DEFENDANT:  To say that the custody battles
 7   were awful is the understatement of my lifetime.
 8               And to say that the emotions that I went through
 9   and was suffering from at the time clouded my judgment,
10   again, another understatement.
11               Obviously, I made some monumentally wrong
12   decisions.  If I could go back in time, I wouldn't be here
13   before you today.  I would not have done the things that I
14   did and I would definitely have done things much
15   differently.
16               I would definitely like to apologize at this
17   time to Chris for any pain I have caused her, to my mother,
18   my father, my sister, whoever made me the person I am today,
19   who have given up a great deal to help me, to my friends,
20   old and new, who I love dearly, and my patients, who I never
21   had any intention of abandoning, ever, and most importantly,
22   to my daughters for the trauma that they have been put
23   through.
24               Again, a second chance is all I am asking for
25   this afternoon, today.  I would like to get back into seeing
```

1    patients, taking care of people, which is the one thing I

2    seem to excel at, the one thing I enjoy doing most in my

3    life, the support of my family, my friends, my colleagues.

4              I do understand I have a couple of job offers

5    waiting for me as soon as I am released.  I will rededicate

6    myself to helping people, to caring for individuals when I

7    leave here, and to making enough money to support my

8    children, specifically my autistic daughter, who is going to

9    require a great deal of money to cover her care.  And you

10   will never have an opportunity to see me back in a courtroom

11   again, Your Honor.

12             Thank you.

13             THE COURT:  Thank you, Doctor.  Why don't you

14   have a seat.

15             Mr. Medrano, is there anyone else that you wish

16   me to hear from?

17             MR. MEDRANO:  No, Your Honor.

18             THE COURT:  All right.  Mr. Burke.

19             MR. BURKE:  Your Honor, one of the victims, Ms.

20   Belford, wishes to address the Court.  Will the Court permit

21   her to do that now?

22             THE COURT:  I will.  Why don't you pull that

23   mike down, Ms. Belford.

24             MS. BELFORD:  Good morning.

25             I address the Court today on behalf of myself

1  and my daughters, Laurie, Leigh, and Karen.   These young

2  girls are innocent victims of crimes committed by their

3  father, David.   My victimization stands secondary to the

4  things that they witnessed and endured and suffered while in

5  the care of their father, during their abduction to Central

6  America.

7          I would like to talk about the girls now.

8          Laura, being the oldest, seems to have the most

9  emotional scars as a result of her father's choices which he

10 made while on the run from authorities.   She was told I was

11 dead.   She was in a foreign land and at the mercy of her

12 father's choices.   How terrible it must have been for her to

13 be mourning me while so far away, especially with an

14 unsympathetic father for support.   She was told to use a new

15 first and last name.   She lived in a motor home with four

16 people.   She was often responsible for babysitting her two

17 younger sisters.   She had many chores and responsibilities,

18 well beyond her years.

19         Leigh, our middle daughter, diagnosed with

20 autism, suffered the most evident lack of physical care as a

21 result of their father's choices.   Her dental care alone

22 attests to the fact that her father cared not for her needs

23 as much as his own.   That is particularly disturbing as she

24 cannot communicate as other children could.   She was in

25 great pain from abscessed teeth when she returned and

1    underwent surgery at A.I. du Pont Hospital.

2              Karen, the youngest, seems to be the least

3    affected at this time.  She was very young when she was

4    taken from her home.  However, as with all the girls, I

5    anticipate many difficult questions and emotional upsets in

6    future years, as I struggle with a way to explain why their

7    father would make such decisions.

8              At this time I want to address David's attempts

9    to defend his actions.

10             He claims Laura was sexually abused by me prior

11   to the abduction, an accusation he tries to rationalize as,

12   obviously, an attempt to look like a self-sacrificing

13   father, putting all his needs aside in the best interests if

14   the children.

15             I absolutely deny this allegation.  And I would

16   like to say on record in this Court, it's an absolute lie.

17   I find it disgusting that this would be used as a defense.

18   He continues to show that he does not care about anyone but

19   himself in saying this.

20             This lying continues to hurt me and the family,

21   and we suffer the consequences of these words outside of

22   this courtroom.

23             David very obviously put the children's needs

24   and best interests aside when he made plans to take the

25   girls and conceal them from a very loving and able mother, a

1   mother who for 19 months wondered if her children were alive

2   and well, safe and loved.

3            How very shocked I was to learn from the embassy

4   investigators in this case that I was dead from an apparent

5   suicide.  How very distraught I was to learn that my name

6   had been forged and witnesses were used to use the marital

7   home to give David $249,000.  How very angry I was to learn

8   that according to investigators David had been planning this

9   abduction for at least one year prior to executing the plan.

10           Very clearly, David took the law into his own

11  hands, directly disregarding a Delaware Judge's orders for

12  joint custody.  Very clearly, David had no intention of ever

13  honoring the divorce separation agreement for division of

14  assets when he forged my name and absconded with the money

15  and with the children.

16           And lastly, and most clearly, I remember the

17  words of Dr. Samuel Robrowski (phonetic) during the custody

18  trial when he stated that David was at risk of losing touch

19  with reality.  I think this episode not only attests to the

20  fact that Dr. Robrowski correctly diagnosed David, I think

21  it leads to an obvious question:  Is David capable of

22  rehabilitation into society?  Has he reflected on his

23  choices and actions?

24           Originally, he pled not guilty, only to change

25  his plea when he realized there was no question about his

1    guilt.  Is that remorse or just a calculated loss?

2              I feel it appropriate that David be held

3    accountable for his actions in accordance with the

4    Sentencing Guidelines and the initial recommendations made

5    by the presentencing investigation.

6              He hurt so many when he made these choices and

7    took these actions.  The children were the primary victims,

8    but there are others to consider.  His actions were

9    deceitful and his behavior unconscionable.

10             Thank you.

11             THE COURT:  Thank you.

12             Mr. Burke.

13             MR. BURKE:  Thank you, Your Honor.

14             Your Honor, in this case, the government is

15   recommending a sentence for the defendant at the top end of

16   the Guideline range, a sentence of 48 to 51 months, because

17   not only of the facts and circumstances of his offense, but

18   also the impact, significant impact that his offense had on

19   the victims in this case, particularly his ex-wife, Ms.

20   Belford, and, of course, his children, an impact that will

21   clearly last a lifetime, most likely.

22             Your Honor, if I may talk about each of the

23   factors I know the Court will consider.

24             First, with respect to the nature and

25   circumstances of the offenses here and the need for the

sentence the Court imposes to reflect the seriousness of

those offenses, to promote respect for the law and to

provide just punishment for those offenses, the Court has

taken into account those intentions of Section 3553(a)(1)

and (2)(A).  First, with respect to the International

Parental Kidnapping offense here, a few points that the

government believes are important.

This offense was not, as the Court has noted, a

rash decision that was made in haste.  It was an offense

that began as early as December of 2006.  The first date in

which the records show the defendant was attempting to

obtain, and continued to do that, false identification

documents, with his picture, his children's picture, his

mother's picture, beginning to obtain those documents as

early as December of 2006, then on through 2007, including

fake Social Security cards, fake passports, fake citizenship

documents, all that were found on his person or in the motor

home in which he was living when he was arrested.

In July of 2007, he and his mother purchased the

motor home that he used in his flight for over $80,000 and

he sold his practice, circulated the lie about taking his

children to Disney World for that vacation, and then planned

his escape.

Your Honor, it is important to note not only was

this an offense where there was a significant amount of

planning, but for the investigations of investigators, there

is every reason to believe that today the defendant and his

children would still be in flight.

How do we know that?  When he was gone, he

purchased a $170,000 home in Panama, which they transferred

to Nicaragua in an effort to stay ahead of investigators.

Again, they bought a piece of property there for over

$55,000.

Indeed, those are the actions of someone who

wasn't planning on turning around any time soon of his own

volition, but someone who was planning to stay in those

areas for quite a while.  That is why he was buying

property.

Of course, the major part of this offense is the

impact that it has on his family.  Not to mention, of

course, the fact that his children lost 19 months with their

mother and other family members, but also the fact that they

spent those 19 months primarily living in a cramped and

dirty motor home.  The Court saw pictures attached to the

government's sentencing memoranda, the way the motor home,

with cramped space, looked on the day of the arrest.  It was

filthy.

They didn't have their friends nearby, these

children.  They didn't have proper health care, dental care.

As I mentioned, they didn't go to school in the way they

1    would have back here in Delaware for 19 months of their

2    lives.

3              The impact that had on Ms. Belford from her

4    statements and in her victim impact statement that she sent

5    to the Court through Probation, she noted that even to this

6    day and into the future, she will be waiting, wondering

7    whether there will be retaliation from David:  Will he

8    abduct the girls again?

9              She also spoke of the fears of her children, the

10   impact that has on her, noting that her oldest daughter

11   Laura at one point when she was looking for Ms. Belford

12   recently wondered and couldn't find her, when Ms. Belford

13   was picking her up, wondered whether Grandma and Daddy were

14   here to get her.

15             And, of course, the impact on the children

16   themselves, Judge.  The oldest daughter, Laura, who has been

17   diagnosed with post-traumatic stress disorder since she has

18   been back in the country, she has had to spend time getting

19   mental health counseling as a result of that, who at the

20   time she returned had lost 30 pounds and now is having

21   issues with food, as the Court read in the presentence

22   report, as well as nightmares, and the impact that this had

23   on the defendant's middle daughter, Leigh, who has autism.

24   As the presentence report notes, when she returned, she had

25   rotting teeth and had to have three teeth extracted, two

1    root canals, and four caps placed on those teeth.

2             Not only those physical and mental harms that

3    were subjected to these children, but also as Ms. Belford

4    has noted the fact that the defendant told them that she was

5    dead and that she committed suicide.

6             In her victim impact statement Laura wrote

7    simply one sentence:  "I am mad about it.  They lied about

8    mom being dead."

9             Your Honor, I pointed those things out because

10   they underscore the impact on these kids is long-lasting,

11   and on Ms. Belford as well.  It won't go away.  It will be

12   there for likely their entire lives.

13            Your Honor, there is also another federal crime

14   here obviously.  The federal crime of bank fraud, when the

15   defendant stole approximately a quarter of a million dollars

16   through fraud and forgery in a WSFS bank fraud offense.  He

17   transferred that money overseas.  The government wasn't able

18   to find the ultimate location of where those proceeds went.

19   WSFS, one of the victims, of course, had to expend hundreds

20   of man-hours and significant attorneys' fees to deal with

21   that fraud.

22            But this fraud was also, as I think the Court

23   noted, another serious harm to the defendant's ex-wife.  She

24   was entitled to a hundred thousand dollars in equity out of

25   that house.  But by committing the fraud, of course, the

1    defendant took all that money and more, sent it overseas,

2    never to be seen again until the government was able to

3    recover some restitution for the victim WSFS.

4              Your Honor, those facts all speak to the nature

5    and circumstances of the offense in this case.  But there is

6    another series of considerations you will have to consider.

7    It is the need for the sentence you impose to afford

8    adequate deterrence on criminal conduct and to protect the

9    public from future crimes of the defendant, as set forth in

10   Section 3553(a)(2) of the federal statute.

11             It is, of course, true and the Court has noted

12   that in this case the defendant prior to these crimes had a

13   record of success professionally, and Mr. Medrano has talked

14   about community service that the defendant participated in.

15   Of course, the Court will consider that.

16             But the reality is, I think there is a clear

17   record in the presentence report and the materials provided

18   to the Court that there was also another Dr. Matusiewicz,

19   one that, and it's pretty clear from the letters the Court

20   received, a lot of his friends, people he has known for a

21   while, just didn't know about, a private side.  And those

22   facts there are troubling.

23             Briefly.  Ms. Belford has noted that long prior

24   to the kidnapping, the defendant on multiple times said if

25   she left him she wouldn't see her children again.

```
 1                    There were also --

 2                    MR. MEDRANO:  Your Honor, with all due respect,

 3    I am going to object to this.  Judge, there has already been

 4    a determination by a Family Court Judge that those

 5    allegations were unfounded and that's why they were

 6    dismissed.  So for counsel for the government to come now

 7    and again make the same allegations when there has been

 8    another Court ruling in Family District Court here in

 9    Delaware saying they were unfounded and they were dismissed

10    I think is inappropriate.

11                    THE COURT:  I will let you respond, Mr. Burke.

12                    Is that Court's ruling binding on this Court?

13                    MR. MEDRANO:  Your Honor, I would say that it

14    is, Your Honor, because of the fact that that issue was

15    decided in the Court of original jurisdiction concerning

16    whether or not those allegations were true and correct.  And

17    therefore, I think --

18                    THE COURT:  I don't think I have to resolve the

19    issue one way or the other, quite frankly.

20                    MR. BURKE:  Judge, I will just note, I refer to

21    what are now unobjected to facts in Paragraphs 30 and 46 of

22    the presentence report that the Court has admitted into the

23    record.

24                    THE COURT:  I was going to come to that.  That

25    is the case.  I do believe -- and if you disagree with me,
```

1    Mr. Medrano, I have given you every opportunity to make your

2    position clear on the record.  So I am going to overrule

3    that objection.

4              MR. BURKE:  In addition, Your Honor, there is

5    also, and this can't be objected to, the findings that we

6    know of, and Ms. Belford mentioned them, Dr. Rome in the

7    Family Court case, who noted, although joint custody was

8    obviously given, that the defendant at that time had an

9    unhealthy tendency for what he called perseverate, meaning

10   taking the same approach to a situation even after getting

11   feedback that his approach wasn't working and that he was at

12   risk for losing touch with reality.

13             There is also what I think is the strange

14   history that the defendant had for a number of years of

15   association with this Millionaire's Club that is listed and

16   referred to in the presentence report, a group of

17   international people who the defendant was interacting with

18   as far back as 2005 and who helped him, among other things,

19   obtain false identification that he had with him during his

20   flight; that helped him set up a Bank of New Zealand bank

21   account that he transferred the fraud proceeds into in this

22   case and that in 2007 alone he transferred over $600,000

23   into in that year, moneys that the defendant says today he

24   doesn't know where they are.  Of course, all moneys that

25   would be certainly necessary for his children, his family,

1    were they here.  But those moneys, along with the fraud

2    proceeds in this case, were transferred to a New Zealand

3    bank account, not to be seen again.

4          It is a group of people the defendant was

5    associating with who believes in something called the Hut

6    River Province, that there is this land mass in Australia

7    that the defendant was seeking to become a citizen of

8    because it claims it's no longer a part of the Australian

9    Government.

10          The defendant in his own papers called a lot of

11   this behavior, that it sounds silly, it does.  It's not the

12   actions of someone who the Court can have some confidence is

13   behaving in this stable, predictable manner for a number of

14   years prior to this offense.  It is at least another data

15   point of potential concern.

16          But I think, Judge, perhaps the most significant

17   thing, and you referred to it, is the fact that I think even

18   throughout this case, even leading up to sentencing today,

19   there is a real sense that the defendant has not fully

20   internalized not only the impact that his actions had,

21   particularly on his children, but also a sense of

22   responsibility beyond pleading guilty, but taking

23   responsibility.  A few points about that.

24          First, the defendant in a letter to Probation

25   noted, as quoted in the presentence report, that he does not

1      believe that any harm was inflicted on his children by

2      taking them to live with him and the grandmother.  He said

3      something different today, I think.  But he also has

4      indicated, in the presentence report in this case, that his

5      children were not victims, all I think borne out of an idea

6      that somehow there is not really serious harm that was

7      occasioned by the fact that for 19 months they were living

8      in a remote Central American country.

9                    He also has referred to consistently in this

10     case WSFS, the bank fraud victim, as receiving windfalls or

11     profits, not because of anything he did but because the

12     government was able to obtain restitution for them, as if

13     WSFS was somehow fortunate to have been defrauded by the

14     defendant in this case.

15                   But perhaps the point that was most striking,

16     Judge, is defendants had the chance to write you before

17     sentencing.  They send you a letter.  That is important.  It

18     says who they are and what they are thinking about what has

19     happened.  I just received the defendant's letter last night

20     from the Probation Office and read it.  That letter to you

21     is three pages.

22                   At least 75 percent of that letter is not the

23     defendant taking responsibility, saying I understand what I

24     did and the impact it had.  A lot of that letter is blaming.

25     It is blaming his ex-wife, Ms. Belford, for what happened.

1       It is the same kind of blame that we have seen elsewhere,

2       leading up to this sentencing, certainly.

3                    And all these things, I think, Your Honor, you

4       noted that if in 2006 you had been asked the question would

5       the defendant commit these crimes based on his prior

6       history, at least the outward history, you might say no, no

7       way.  But he did.  And now we know a lot more.  In fact,

8       when you asked Mr. Medrano, do you know why he did this,

9       even he admits, he can't figure it out.  Because I think

10      it's clear that when you add up these data points together,

11      that even despite that past positive history, there are a

12      lot of facts that should give this Court concern about

13      whether in the future, unless there is some significant time

14      given, where the kids are protected from that because of his

15      incarceration, and also some time to know the seriousness of

16      his conduct, the Court's sentence, will the defendant

17      possibly do something like this again.

18                   The last piece, Your Honor, of course, is not

19      just individual deterrence but it's general deterrence.

20      This case will no doubt have an impact on others.  People

21      will read about it.  There are plenty of cases that go on in

22      Delaware every day and around the country where there are

23      very bitter divorce situations involving kids.  The Court I

24      know has an interest in the general deterrence that its

25      sentences give a sense of to the public.

1          There can't be, there cannot be people who think

2    it is okay to go and take your kids and kidnap them for 19

3    months and that that is a viable option in a situation like

4    the situation that existed in 2007 here before the crimes.

5          So I ask the Court to consider the general

6    deterrence that a significant sentence of incarceration

7    would have on others.

8          For all these reasons, Judge, those are the

9    reasons why we think these crimes, this series of crimes,

10   not only because of the nature of them but because of the

11   real longstanding impact they have had and will have, why

12   they deserve the sentence that the government has

13   recommended that the Court impose.  We ask the Court impose

14   that sentence.  We ask that the Court impose the maximum

15   term of supervised release that he could.

16         And we ask that the Court impose among the other

17   conditions it will impose a condition that requires the

18   defendant to abide by any Court orders regarding contact

19   with his children or with his ex-wife, so that if he were to

20   violate those orders, those would also be a violation of the

21   terms of his supervised release.

22         Thank you, Judge.

23         THE COURT:  Before you sit down -- thank you,

24   Mr. Burke.  I want to make sure I didn't misspeak on the

25   length of supervise his release.

```
 1                    I think I indicated as to Count Four that it

 2       would be a maximum of one year.

 3                    MR. BURKE:  That's correct, Judge.

 4                    THE COURT:  And five years on Count One.

 5                    MR. BURKE:  On Count One, that's correct.

 6                    THE COURT:  Do we agree?

 7                    MR. BURKE:  So a maximum term of five, yes, Your

 8       Honor.

 9                    THE COURT:  The statutory Guideline range.

10                    MR. BURKE:  Correct.

11                    THE COURT:  Did you want to react, Mr. Medrano?

12                    MR. MEDRANO:  Thank you, Your Honor.

13                    First of all, let me address the issue

14       concerning Count No. One, the bank fraud, Judge.

15                    It is interesting to note that the alleged

16       victim in that case, WSFS Bank, did not file any statement

17       with the Court concerning its issues or the fact that it was

18       not reimbursed and made whole, because, in fact, they were.

19       Not only were they made whole, but the calculations and the

20       documents that I provided to this Court concerning the

21       settlement agreements and their sale of the properties and

22       the applications of those funds by WSFS through their own

23       accounting shows not only that they make $30,000 in I call

24       it a windfall profit, but they also made approximately

25       $15,000 in interest, 20-plus thousand dollars in legal fees,
```

1    et cetera, et cetera.

2            Judge, the Sentencing Guidelines are there for a

3    purpose, to go ahead and serve as an advisory for the Court.

4    But the reality is that if we had a WSFS representative here

5    today, sitting here and I would ask him, did your bank lose

6    a penny, the answer would be no.  Did your bank make 60-plus

7    thousand dollars in legal fees, profits and interest?  The

8    answer would be yes.

9            Now, the Court already ruled in its

10   determination the Guidelines say that under the definition

11   of whether or not there was a loss, yes, under the

12   definition there was a loss.  But that ignores the reality

13   that there was no loss.

14           There was no loss.

15           THE COURT:  I understand your position.

16           MR. MEDRANO:  With all due respect to Ms.

17   Belford, prior to my going ahead and representing Dr.

18   Matusiewicz pro bono at the Family Court hearing a month

19   ago, all of her statements to the Probation Office, all of

20   her statements contained in the probation officer's report

21   was that she just wanted him to go ahead and get help, that

22   she wanted David to receive help.  She was concerned about

23   him.  She wasn't going to go ahead and want anything bad to

24   happen to him, for him to get the medical assistance.

25           But as soon as I went ahead and argued

1    successfully to the Family Court that she was not entitled

2    to those $40,000 in additional restitution because of her

3    own actions, as ruled on by Judge Buckworth in the Family

4    Court, she has turned completely 180 degrees around.  She is

5    a victim, that is true.  But the statements that she was

6    making prior to her now losing the $40,000 in Family Court

7    compared to the statements that she is making today are 180

8    degrees black-and-white different.

9                 I think that's something the Court should take

10   into consideration --

11                THE COURT:  I am not sure I agree with that

12   characterization.  I understand your position.  I do believe

13   I understand, at least in part, Ms. Belford to have asserted

14   that she did want Dr. Matusiewicz to get help.  She seems to

15   recognize that at an appropriate time it would be desirable

16   for him to be able to interact and be a father to his

17   children.  That's the way I understand it.  I guess I take

18   issue somewhat with the characterization that it is a 180

19   degrees different since the ruling that you have referenced.

20                MR. MEDRANO:  If I may move on, Judge.

21                There was a couple of inaccurate statements made

22   by counsel for the government in that supposedly whether the

23   children were with Dr. Matusiewicz they did not go to

24   school.

25                THE COURT:  I am aware that they attended some

1    school.

2                 MR. MEDRANO:  Two of them were below school age,

3    Judge.

4                 THE COURT:  There is no question about that.  My

5    head is not in the sand.

6                 MR. MEDRANO:  Yes, Your Honor.  Nor do I want to

7    go ahead and imply that it is.

8                 Your Honor, I will also go ahead and ask the

9    Court to consider that the parental kidnapping charge is

10   different from other federal crimes involving kidnapping of

11   victims and taking them across state lines.  Congress and

12   the courts, through the Guidelines, have stated that when a

13   parent does go and is subject to being punished for what

14   they do concerning kidnapping of their own kids, that there

15   is a cap, a statutory cap of no more than three years that

16   should be imposed for that crime.  And here the government

17   is before the Court asking the Court to go ahead and give

18   him four years or more, when the statute for parental

19   kidnapping says that there is a three-year maximum.

20                The last issue I wanted to address to the Court

21   was this.  The government says that Dr. Matusiewicz's

22   actions in going ahead and forging his wife's signature and

23   taking the money was motivated by his regard to go ahead or

24   wish to go ahead and do away with all the assets so she

25   would be left with nothing.  That is absolutely incorrect,

1    Judge.

2              That's why I went to great lengths to point out

3    to the Court in my objections the accounting, WSFS Bank, who

4    owned the two notes in question, one for $120,000 and the

5    $250,000 note, totaling 370,000, WSFS Bank had its own

6    appraisal done, and I submitted copies of those to the

7    Court, just six weeks before Dr. Matusiewicz went ahead and

8    got the loan.  Those appraisals came back at 510 and

9    $520,000.

10             He knew that if he took the 250,000 and WSFS

11   went ahead and sold the property even for 500,000, there was

12   going to be more than enough money left over, $150,000 was

13   going to be left over, which would satisfy the

14   hundred-thousand-dollar marital award by the Family Court to

15   Ms. Belford.  He knew that.  That's why -- he didn't ask for

16   a $350,000 line, which would have used up all of the equity.

17   He only asked for 249,000, knowing that would leave a

18   balance of 150,000.  Even if WSFS sold the house for 15

19   percent under market value, there was still going to be more

20   than enough money left over for Ms. Belford to get her

21   hundred thousand dollars.  In fact, that's what should have

22   happened when Ms. Belford went back to Family Court and

23   asked Judge Buckworth to get sole possession of the house so

24   they could sell it, the Judge came back in his ruling said,

25   you know what, you are going to go ahead and keep $100,000,

1    the excess amount, because it's valued at $520,000, you are

2    going to go back and deposit that to the regional industry

3    of the Court for the benefit of Dr. Matusiewicz.

4              So it is an incorrect representation to the

5    Court that the motive behind Dr. Matusiewicz in getting that

6    loan was to go ahead and get back at her.  Judge, if he

7    planned to do that, he could have told his bank officer, you

8    know what, give me the maximum amount of credit.  Give me

9    all, what it is, $150,000, that I can borrow on this house,

10   which is appraised at 520, so I can go ahead and get away

11   and leave her with nothing.

12             The last comment I have, Your Honor, is this.

13             Of all of the people that I think have shown

14   remorse and tried to go ahead, and not for purposes of

15   shifting blame but to help the Court understands what his

16   motives were, it's this young man.  He deserves a break, to

17   be able to go ahead and go back and be a productive member

18   of society, Your Honor, so he can go ahead and try to make a

19   living and giving support for his kids and their needs.

20             Thank you.

21             THE COURT:  Thank you, Mr. Medrano.

22             Why don't you have your client join you at the

23   podium there.

24             Dr. Matusiewicz, before I impose sentence, I am

25   required to, and, indeed, it is important that I explain the

reasons for the sentence I will impose.  It is important to

you.  It is important to those in this courtroom.  It is

important to those who might learn of these events outside

of this courtroom.

Dr. Matusiewicz, the United States Supreme

Court's recent decisions in this area, the area of federal

sentencing, direct me to consider a number of factors -- you

have heard us discuss most of them today -- that I should

consider when exercising my judgment and discretion in the

determination of an appropriate sentence for a particular

individual defendant such as yourself.

I am specifically directed by these decisions

and federal statute to impose a sentence that is sufficient

but not greater than necessary to achieve a number of

sentencing goals.  Among them, to justly punish -- it was

suggested I think inadvertently in your lawyer's opening, I

think, dialogue with me, when he used the word "punishment."

There are many other considerations than simply punishment

of the individual transgressor.

Another one of the goals is, and you have heard

about this today, to deter future conduct of the type at

issue.  There are two types of deterrence:  general

deterrence, deterring the public and others generally who

would learn of these events, in the hope that they would

refrain, because of the actions taken here today, from

1    engaging in the type of conduct at issue; and specific

2    deterrence, that is, preventing you, the individual, from

3    engaging in the same conduct at least for the time of any

4    continued incarceration and thereafter; to protect the

5    public; as well as to provide available means in the most

6    effective manner to help with your rehabilitation is an

7    important goal; and last, but certainly not least, to

8    promote respect for the laws of the United States and all of

9    our nation's laws.

10          In attempting to achieve these goals, I and

11   others am directed to consider a number of factors:  the

12   nature and circumstances of the offense; your history and

13   characteristics; we talked a lot about the Sentencing

14   Guidelines today; and the kinds of sentences available to

15   me.

16          So these things have been on my mind for some

17   time in contemplating this day, and are on my mind at

18   present.

19          Dr. Matusiewicz, if there is one unifying theme

20   in your actions in this case, it seems to me it's a breach

21   of trust.  Perhaps most obviously, you stand here today in

22   part because you breached the trust of WSFS, the bank that

23   you defrauded.  You lied to a bank employee in order to

24   obtain a loan, and you forged your now ex-wife's signature

25   in order to complete the transaction.  She was, of course,

1    your wife at the time.

2              The bank apparently has been made whole.  Your

3    lawyer has vigorously argued that point.  But that, as I

4    have ruled, as you know already, it was not due to actions

5    that you took on behalf of the bank either directly or

6    indirectly, or actions that were taken on your behalf.  On

7    the contrary, you fled the country, with no apparent

8    intention of ever paying back the money that you

9    fraudulently obtained.  And you, in addition, went to

10   considerable lengths to make it difficult to trace the funds

11   that you took.  It was only because of the persistence and

12   expenditure of significant resources by federal law

13   enforcement that these funds were recovered.

14             But the bank was not the only party whose trust

15   you breached through your actions.  You breached the trust

16   of the Family Court of the State of Delaware, indeed, of our

17   legal system, in my view, as a whole, by kidnapping your

18   children and taking them outside the jurisdiction of the

19   United States.  When you and Ms. Belford appeared before the

20   Family Court to determine the custody arrangements of your

21   children or have determined, with the assistance of the

22   Court, those arrangements, the Court was counting on you and

23   Ms. Belford to abide by the rules.

24             In order to function properly, our legal system

25   in general, and I think family courts in particular, rely on

1    the good-faith participation of the parties who appear

2    before them.  You breached that trust I think in almost an

3    absolute manner by taking your children and leaving the U.S.

4              Of course, you breached the trust of Ms.

5    Belford.  Even former spouses have responsibilities, as I

6    suggested earlier, toward each other, Dr. Matusiewicz,

7    especially when it comes to the care and custody of the

8    children that are the product of the union that was your

9    marriage.

10             Ms. Belford was relying on you, I think

11   justifiably and with full right, to adhere to the Court's

12   order when she acceded to the Family Court's initial order

13   giving you custody of the children, and she certainly was

14   relying on you to return the children safely to Delaware

15   when you told her you were taking them to Disney World back

16   in the summer of '07.  You breached that trust in what I

17   view as a truly shocking manner when instead you took her

18   children overseas and told them that she had killed herself.

19             Finally and most importantly, Dr. Matusiewicz,

20   you breached the trust of your three young children.  Your

21   children were relying on you to do right by them, Dr.

22   Matusiewicz.  Whatever your disputes with Ms. Belford, your

23   children had a right to maintain their relationship with

24   their mother.  At the time you fled the country, they were

25   far too young to understand what was happening to them, and

1  they were at an important, all of them, and vulnerable stage

2  of their lives in terms of their physical, emotional, and

3  educational development.

4          Your letter to me seems to give the impression

5  that you decided to act because of a single remark made by

6  your youngest daughter.  But your actions cannot be

7  dismissed as the byproduct of a single argument, or

8  incident, or event.  And I must add that I concur in Mr.

9  Burke's assertions as to the bulk of the letter as

10 deflecting responsibility away from yourself.  It is clear

11 that you prepared for months for the kidnapping of your

12 children, and, indeed, that the conduct underlying the bank

13 fraud was a part of that preparation.  During those months

14 of preparation, as far as I can tell -- and I have suggested

15 this earlier and no one has answered on your behalf the

16 question -- you never said a word to the Family Court, Child

17 Protective Services, law enforcement, or anyone else about

18 your concerns, the concerns you now claim to have had for

19 the safety of your children.  In fact, I have seen no

20 indication that you raised those concerns at all before you

21 were arrested.

22         It is also difficult for me to give much weight

23 to your protestations that you acted in order to protect

24 your children because your actions in this case showed a

25 conscious and reckless disregard for their health and

1   welfare.  Not only did you remove them from their mother,

2   but you took them in a motor home through Central America,

3   thousands of miles from their family, friends, physicians,

4   schoolmates, schools, teachers.  This is particularly

5   galling, I think, in light of your daughters' ages and the

6   fact that one of them was a three-year-old child at the time

7   with autism, who would have had a difficult time

8   communicating her concerns even under the best of

9   circumstances.  I cannot fathom how you possibly could have

10  thought that it would be in their best interests to take

11  them thousands of miles away to live in a motor home in

12  Nicaragua.

13          Before you committed these crimes, it appears by

14  all accounts that you were, indeed, an upstanding,

15  law-abiding citizen with a good job, who was respected in

16  your profession and your community, and maintained a

17  thriving practice in the area of optometry.  While I take

18  into account as a potentially positive indicator your

19  prospects after sentence of your reintegration into society

20  these things, I also have to recognize that you had other

21  options, Dr. Matusiewicz.  You had other options.  You had

22  the ability to pay for a lawyer; a strong and supportive

23  group of friends, and family, and colleagues; and a Family

24  Court that once saw fit to award you at least joint custody

25  of your children.

1              You had other options, Dr. Matusiewicz.  And

2    virtually every one of them would have been better for your

3    children than the one you chose.

4              So it is my belief that the sentence I am about

5    to impose comports with the objectives listed in Title 18,

6    Section 3553(a).  And it is my hope that this sentence will

7    provoke in you greater respect for the law.  In my opinion,

8    the sentence that I am about to impose will appropriately

9    reflect the seriousness of the offense you committed.  It

10   will also serve to appropriately punish you and hopefully

11   deter you from this type of conduct as well as others in the

12   future.

13             So it is with these thoughts in mind, sir, and

14   pursuant to the Sentencing Reform Act of 1984, that I

15   exercise my judgment and discretion and sentence you, David

16   Matusiewicz, to the custody of the Bureau of Prisons for a

17   term of 48 months for Count One and 36 months for Count

18   Four, to be served concurrently.

19             Upon your release from imprisonment, you should

20   be placed on a period of supervised release on concurrent

21   terms of five years on both Count One and three years on

22   Count Four -- I am sorry, Count One.  I stand corrected.

23             Within 72 hours of your release from the custody

24   of the Bureau of Prisons, you shall report in person to the

25   Probation Office in the district into which you are

1    released.  While on supervised release, you shall not commit

2    another federal, state, or local crime, and you shall comply

3    with the standard conditions that have been adopted by this

4    Court.

5           You shall comply with the following additional

6    conditions:

7           You shall not illegally possess a controlled

8    substance; you shall not possess a firearm, destructive

9    device, or ammunition of any kind; you shall cooperate in

10   the collection of DNA as directed by your probation officer.

11   And in addition, you shall comply with the following special

12   conditions:

13          At the direction of your probation officer, you

14   shall participate in mental health counseling; and secondly,

15   you shall adhere to the orders of the Family Court of New

16   Castle or any other family court, for that matter, with

17   respect to your contact with your children Laura, Leigh, and

18   Karen.

19          It is further ordered that you shall pay to the

20   United States a mandatory special assessment of $200, which

21   is technically due immediately.

22          The Court finds the Violent Crime Assistance

23   Program has suffered a loss of $9,674 which is compensable

24   under the Mandatory Restitution Act and is also due

25   immediately.

1          During your term of incarceration, I recommend

2    you participate in the Inmate Financial Responsibility

3    Program to defer these obligations, that is the special

4    assessment, if you cannot afford to pay that today and the

5    restitution I have just ordered.

6          Any portion of the restitution that is not paid

7    in full at the time of your release will become a condition

8    of your supervision.

9          While on supervised release, you shall not pay

10   less than $100 a month for restitution, unless otherwise

11   unable to do so, and that would be a matter that you would

12   take up with United States Probation.

13         The Court will waive the requirement for the

14   payment of interest on the restitution.

15         Within 60 days of your release from

16   imprisonment, the U.S. Probation Office shall reevaluate

17   your ability to pay restitution and make any appropriate

18   recommendations to the Court.

19         I find you do not have the ability to pay a

20   fine, and thus a fine will be waived in this case.

21         Other than those reasons already discussed,

22   counsel, are there any other reasons that you want to

23   advance why sentence should not be imposed as announced?

24         MR. MEDRANO:  May I have just one moment, Your

25   Honor, please?

1              **(Counsel confers with defendant.)**

2              **MR. MEDRANO:  Your Honor, there is a request we**

3    **ask the Court to go ahead and take into consideration, that**

4    **is this:  Because of the time of the sentence the Court has**

5    **imposed, my client still hasn't made up his mind as to**

6    **whether or not he would like to go ahead and request the**

7    **Court to make a recommendation that he be incarcerated down**

8    **in Texas where his family is.  His mom is still incarcerated**

9    **here in Delaware.  But we are hoping that when she is**

10   **released, she would probably be going back to Texas.  Even**

11   **though she and her husband, his father, will continue to be**

12   **living here in Delaware, he will be down in Texas.**

13             **Can I ask the Court to go ahead and allow me ten**

14   **days to file a supplemental request that the Court recommend**

15   **that he be transferred and incarcerated in Texas to serve**

16   **the remainder of his sentence?**

17             **THE COURT:  I wonder if I don't lose**

18   **jurisdiction to make any recommendation at that point.**

19             **Mr. Burke, do you have a view?**

20             **MR. BURKE:  Judge, what I would say is, with**

21   **respect to the Court's recommendation, which may or may not**

22   **go into the judgment, I don't know that it's a part of the**

23   **sentence itself.  I think it's an additional recommendation**

24   **the Court may include in a judgment, a judgment which the**

25   **Court can take some time to issue.**

1          But I don't see a problem, necessarily, with

2     that.   I don't have an objection to a recommendation being

3     made.

4               THE COURT:  I don't have any fundamentally.

5               PROBATION OFFICER MATTHEWS:  I agree.

6               MR. MEDRANO:  Especially in terms of the fact we

7     need to speak with his father, his mother.

8               THE COURT:  Sure.  So you are asking that ten

9     days from today you contact the Court with regard to where

10    you want me to recommend that he serve his sentence?

11              MR. MEDRANO:  Please.

12              THE COURT:  Your client understands that that is

13    merely a recommendation, that the Bureau of Prisons will

14    make that determination.  That is why the Executive

15    Branch -- I have no ability to order them in this regard.

16              Do you understand that, Doctor?

17              THE DEFENDANT:  Yes, sir.

18              THE COURT:  Other than that, any objections or

19    do you want to advance any other reasons why sentence should

20    not be imposed as announced?

21              MR. MEDRANO:  No, Your Honor.

22              MR. BURKE:  No, Your Honor.

23              THE COURT:  It is the order of the Court that

24    sentence be imposed as previously stated.

25              Dr. Matusiewicz, you have the right to appeal

1    this sentence within ten days.  In order to do that, you

2    should discuss that matter with your lawyer.  If you cannot

3    afford the costs of this appeal, you should file for leave

4    to file that appeal without paying those costs.  This is

5    called filing the appeal in forma pauperis.

6              Our Clerk's Office shall prepare the judgment,

7    and my Chief Deputy will enter the judgment of conviction.

8              I wish all the parties involved in this much

9    luck in the future.  As I think Mr. Medrano alluded to

10   earlier, this has been a difficult matter.

11             MR. MEDRANO:  Your Honor, may I escort my client

12   down to the Marshal's Office after this, please?

13             THE COURT:  It's up to them.

14             MR. BURKE:  Judge, with the Court's permission,

15   I will file in open court a motion to dismiss Counts Two and

16   Three of the superseding document with Ms. Walker.

17             THE COURT:  That is fine, Mr. Burke.

18             We will recess.

19             (Court recessed at 11:50 a.m.)

20

21                        -  -  -

22   Reporter:  Kevin Maurer.

23

24

25